UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


LIBERTY MUTUAL INSURANCE CO., )
                              )
        Plaintiff,            )
                              )
        v.                    )
                              )
THE BLACK & DECKER CORP.,     )    CIVIL ACTION
BLACK & DECKER, INC.,         )    NO. 04-10654 (Berks)
BLACK & DECKER, U.S. INC.,    )    NO. 04-10659 (BROS)
EMHART CORP., and EMHART      )    NO. 04-10662 (Huth)
INDUSTRIES, INC.,             )
                              )
        Defendants.           )


MEMORANDUM AND ORDER
REGARDING SUMMARY JUDGMENT FOR
BROS, HUTH, BERKS/DOUGLASVILLE CLAIMS
January 13, 2005


        In this Memorandum I address issues of Maryland law

presented by summary judgment motions as they relate to three

sites located in New Jersey ("BROS"), Ohio ("Huth"), and

Pennsylvania ("Berks").  The fundamental question before me is

whether Liberty Mutual is obligated to compensate Black & Decker,

under Liberty Mutual insurance policies issued to Black & Decker

or its corporate predecessors, for various expenses arising from

the cleanup of environmentally contaminated land.

**I. Standard of Review**

        Summary judgment is appropriate when "the pleadings,

-1-

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103 (1995). Once the movant has made such a showing, the nonmovant must point to specific facts demonstrating that there is, indeed, a trialworthy issue. Id.

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), and a "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of

law on facts that are not disputed. <u>See</u> <u>Adria Int'l Group, Inc.</u> <u>v. Ferre Dev., Inc.</u>, 241 F.3d 103 (1st Cir. 2001); <u>Wightman v.</u> <u>Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996). Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing inferences against each movant in turn. <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997).

## II. Relevant Policies

Given my prior resolution of Liberty Mutual's motion for partial summary judgment as to certain policy periods, there is a genuine issue of material fact as to the existence and provisions of policies relevant to these three sites for the years 1940 until 1970.  To the extent either party's arguments rely on the existence or provisions of such policies, they are insufficient to form a basis for summary judgment.  The policies in place from 1970 to 1979 will be the touchstones for the following discussion.

## III.  Maryland Legal Principles

The claims arising out of the sites at issue are governed by Maryland law and involve the first major application of that jurisdiction's legal principles in this lengthy litigation. Consequently, the following section is devoted to summarizing the legal principles most relevant to these three sites.  For the most part, those principles will be applied in relation to the

duty to defend -- the primary, overarching legal question
implicated at the BROS, Huth, and Berks sites.

"Maryland does not follow the rule, adopted in many
jurisdictions, that an insurance policy is to be construed most
strongly against the insurer." Cheney v. Bell National Life, 315
Md. 761, 766-67 (1989).  Instead, Maryland takes the view that
insurance policies are to be construed like other contracts in
order to determine the parties' intentions.  See Sullins v.
Allstate Ins. Co., 340 Md. 503, 508-09 (1995); Cheney, 315 at
766-67; Home Exterminating Co. v. Zurich-American Ins. Group, 921
F. Supp. 318, 322 (D. Md., 1996).  Courts are to give words their
"customary, ordinary, and accepted meaning."  Cheney, 315 Md. at
766-67.  "A word's ordinary signification is tested by what a
reasonably prudent layperson would attach to the term." Bausch &
Lomb v. Utica Mutual, 330 Md. 758, 779 (1993).  In the context of
insurance policies in particular, the Sullins court noted that
"if the language . . . suggests more than one meaning to a
reasonably prudent lay person, it is ambiguous." Sullins, 340
Md. at 508 (citing Collier v. MD-Individual Practice, 327 Md. 1
(1992); Pacific Indem. v. Interstate Fire & Cas., 302 Md. 383
(1985)).  Courts should take notice of any indication that the
parties have given the words a technical meaning.  Cheney, 315
Md. at 766-67.

If necessary, courts also may consider extrinsic evidence in
determining the intentions of the parties.  Sullins, 340 Md. at

-4-

508; <u>Cheney</u>, 315 Md. at 766-67.  In the event such evidence does

not disclose the intentions of the parties, the policy will be

construed -- like a traditional contract -- against the drafter

of the insurance policy, traditionally, the insurer.  <u>See</u>

<u>Collier</u>, 327 Md. at 6; <u>Mut. Fire, Marine & Inland Ins. v.</u>

<u>Volliner</u>, 306 Md. 243, 251 (1986).

The <u>Home Exterminating</u> court emphasized:

Of equal importance is the long-standing rule in Maryland
that insurance policy terms may not contravene an important
public policy. . . .  The Maryland Court of Appeals has
cautioned, however, that courts should be hesitant[]
    "to strike down voluntary bargains on public policy
grounds, doing so only in those cases where the
    challenged agreement is patently offensive to the
    public good, that is where 'the common sense of the
    entire community would . . . pronounce it' invalid.
    This reluctance on the part of the judiciary to nullify
    contractual arrangements on public policy grounds also
    serves to protect the public interest in having
    individuals exercise broad powers to structure their
    own affairs by making legally enforceable promises, a
    concept which lies at the heart of the freedom of
    contract principle."

<u>Home Exterminating</u>, 921 F. Supp. at 322 (citations omitted).


**A. <u>Duty to Defend</u>**

The duty to defend provisions in the various Liberty Mutual

policies at issue here are substantially similar in most

pertinent respects and have remained relatively unchanged over

the several decades during which coverage is alleged.  In

addition, the wording of these clauses appears to be fairly

standardized throughout the insurance industry, thus making

judicial decisions in this area readily applicable.

The Court of Appeals of Maryland recently restated its longstanding approach to the duty to defend:

> [W]e have followed the rule that, where a duty to defend is included in a liability policy, the insurer is obligated to defend its insured "when there exists a 'potentiality that the claim could be covered by the policy.'" . . . . [I]n determining whether a liability insurer has a duty to provide its insured with a defense to a tort action, "two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy [and] (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage?" The first question, we added, "focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit." . . . [W]e expanded the scope of the second inquiry somewhat. . . . [A]t least where the underlying complaint in the tort action neither conclusively establishes nor conclusively negates a potentiality of coverage, an insurer must examine any relevant extrinsic evidence brought to its attention that might establish a potentiality of coverage.

Montgomery County Bd. of Educ. v. Horace Mann Ins. Co., 860 A.2d 909, 915 (Md. 2004) (citations omitted) (emphasis in original); see Baltimore Gas and Elec. Co. v. Comm. Union Ins. Co., 688 A.2d 496, 505 (Md. App. 1997) ("The law in Maryland is well settled that an insurer's duty to defend its insured under a liability insurance policy arises when the insured is sued on a claim that is covered, or is potentially covered, by the insurance policy; the duty is ordinarily determined based on the allegations in the suit and the language of the policy.") (collecting cases). It is the allegation that triggers the duty, "no matter how attenuated,

frivolous, or illogical that allegation may be." <u>Sheets v.
Brethren Mut. Ins. Co.</u>, 679 A.2d 540, 544 (Md. 1996).

In the event potentiality is not shown by the complaint
alone, "an insured can establish a potentiality of coverage by
relying on . . . 'other sources available at the time defense is
tendered.'" <u>Northern Ins. Co. of New York v. Baltimore Bus.
Communications, Inc.</u>, 68 Fed. Appx. 414, 2003 WL 21404703, at **2
n.5 (4th Cir. June 19, 2003) (quoting <u>Harford Cty. v. Harford
Mut. Ins.</u>, 610 A.2d 286, 295 n.6 (Md. 1992)).  "By contrast, if
the allegations in an underlying complaint raise the potentiality
of coverage, the general rule is that the 'insurer may not
introduce extrinsic evidence that would take the claim outside
the policy's coverage.'" <u>Id.</u> (quoting <u>Baltimore Gas & Elec. Co.</u>,
688 A.2d at 509).

1. <u>"Suit" Trigger</u>

The operative language of each duty to defend clause states
that Liberty Mutual shall "defend any suit against the insured
alleging such injury . . . even if such suit is groundless, false
or fraudulent." (<u>E.g.</u>, 1957 Standard Policy Jacket, Defs.' App.
XIII at 102.)[1]  Thus, a threshold issue is whether there has been

---

[1]Policy language did vary over time.  For instance, this
provision was rephrased in 1966 as the "duty to defend any suit
against the insured seeking damages on account of . . . property
damage, even if any of the allegations of the suit are
groundless, false or fraudulent." (1966 Standard Policy Jacket,
Defs.' App. XIII, at 121.)  Except where otherwise noted, such as
the switch from "accident" to "occurrence" language, <u>see</u> Master
Mem., at 110, such changes in policy language are immaterial to

-7-

a "suit" which would trigger the duty to defend.  None of the policies defines the term "suit."

The law in certain states, such as Massachusetts, does not confine "suit" to a formal lawsuit for purposes of triggering a duty to defend. See Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 696 (1990) (holding that a federal EPA letter indicating that the company was a potentially responsible party ("PRP") under CERCLA was "substantially equivalent" to a lawsuit); Zecco, Inc. v. Travelers, 938 F. Supp. 65, 67 (D. Mass. 1996) ("[W]here an insured's failure to respond adequately to a pre-suit letter would significantly affect the insured's ability to defend itself in a subsequent action arising out of the same subject matter and is 'substantially equivalent to the commencement of a lawsuit,' the letter may be sufficient to invoke the insurer's defense obligations to the insured.") (quoting Hazen, 407 Mass. at 696).[2]  Although Maryland courts

---

the issues in this case.

[2]I have addressed this issue in greater depth when examining the law of Massachusetts.

The term "suit" is not strictly confined to lawsuits, but rather includes certain circumstances where no actual complaint has been filed.  In Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 696 (1990), the Supreme Judicial Court held that a letter from the federal EPA indicating that a company was a potentially responsible party ("PRP") under CERCLA was "substantially equivalent" to a suit for purposes of the duty to defend.  The coercive power of CERCLA's statutory regime, the court reasoned, left the insured with no other practical choice but to submit to a pretrial settlement in order to avoid trial. Id. at 697.  The Hazen Paper court also found significant that the PRP letter described an actual release of pollutants, not

have not definitively declared the boundaries of a suit

triggering the duty to defend, there is no reason to think that

Maryland courts would not, if presented squarely with this issue,

follow the reasoning of Hazen and Zecco.

In Bausch & Lomb Inc. v. Utica Mut. Ins. Co., 330 Md. 758

(1993), the Maryland Court of Appeals assessed an insurer's

duties to defend and indemnify in a case where the insured

---

just a potential release. See id. at 695.

On the other hand, the Hazen Paper court held that a letter
sent by the state Department of Environmental Protection ("DEP")
pursuant to the Massachusetts Oil and Hazardous Material Release
Prevention Act, Mass. Gen. Laws ch. 21E, §§ 1-19 (Massachusetts's
version of CERCLA) was not a "suit" that would trigger the
policy.  Id.  The court distinguished DEP's letter, which
indicated that DEP was seeking reimbursement for removal costs
incurred by the state, because the letter "claimed only a threat
of the release of hazardous material" and did not actually
"allege the occurrence of any damage that falls within the policy
coverage."  Id.  Thus, Hazen Paper distinguished a PRP letter,
which describes existing damage within the policy coverage and
requires action, from a letter that merely describes potential
future harm.  Put differently, if the PRP letter was the
functional equivalent to a suit because it alleged damage and
required a response, the DEP letter was more like a threat of a
future suit where the plaintiff's claim had not yet ripened.

In Zecco, Inc. v. Travelers, Inc., 938 F. Supp. 65, 68-69
(D. Mass. 1996), Judge O'Toole further developed this
distinction, and held that a letter from a private party, sent
pursuant to Mass. Gen. Laws ch. 21E, § 4A, was not a "suit" for
duty to defend purposes.  He suggested three guidelines to
consider, in light of Hazen Paper, to determine whether a
pretrial letter should be considered a suit.  Id. at 68.  First,
"a failure to comply with the letter should itself somehow alter
the substantiality of the insured's liability, by making
liability more likely or more devastating or by giving rise to
some particular penalty."  Id.  Second, letters from government
agencies are more significant than those from private parties,
precisely because the consequences are often more severe.  Third,
the tone of the letter is relevant, and a polite offer to discuss
matters is less consequential than an offer the recipient cannot
refuse.  Id.

"initiated the clean-up without legal proceedings having been formally filed against it by a third party, and without a written administrative directive by a government agency that it take such action." Id. at 764. The court noted that "the State agents did not adopt an overtly adversarial and coercive posture," "did not sue the company," and "issued no order." Id. at 780. Nevertheless, the court found that

> "polite but puissant compulsion" may inhere to State regulatory activities, especially when, as here, the regulators actively monitor the clean-up. B & L ultimately faced the task of complying with the environmental laws, and paying the costs of compliance. As such, for the purposes of this analysis, we accept the trial court's finding that B & L's response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay.

Id. (internal citations omitted). The reasoning -- although applied to the indemnity portion of the policy stating that the insurer would "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages," id. at 764 -- is relevant to interpreting what constitutes a "suit." The duty to defend portion of the policy contains the common language regarding defense against "any suit against the insured seeking damages." Id. The damages the insurer will ultimately have to indemnify because of a legal obligation, by extension, should be damages against which they ought to defend, at least to the extent they are incurred in response to the compulsion inherent in enforcement by state agencies.

-10-

As the court in <u>Zecco</u> observed:

> [I]t seems to be more than a coincidence that virtually
> every case discussing the issue involves an express threat
> from some federal or state agency.  It is also noteworthy
> that in a similar case, the Michigan Supreme Court, after
> citing <u>Hazen Paper</u> favorably and holding that an EPA PRP
> letter could be a "suit," took pains to explain that its
> "opinion should in no way be viewed as intimating that every
> request for relief should be considered the initiation of a
> suit that the insurers are obliged to defend. Rather, our
> determination on this issue is made primarily based on the
> unique aspects of CERCLA actions and the authority given to
> EPA under the statute."

<u>Zecco</u>, 938 F. Supp. at 69 (citations omitted).  The court in <u>Ryan
v. Royal Ins. Co. of America</u>, 916 F.2d 731 (1st Cir. 1990) --
quoted by <u>Zecco</u> -- commented that almost all cases "require, at a
bare minimum, some showing of <u>probable</u> and <u>imminent</u> governmental
action as a condition precedent to coverage."  <u>Id.</u> at 738
(emphasis in original).

More generally, the approach to interpreting insurance
policy provisions applied by Maryland courts also warrants a
broader interpretation of the term "suit" than simply a formal
lawsuit.  Although Maryland, unlike certain states, does not
strictly construe insurance policies against the insurer, when
terms are ambiguous they are to be construed against the drafter
of the policy, here, Liberty Mutual.

Until this question is clarified further by the courts of
Maryland, I will determine whether any of the communications
received by Black & Decker were the functional equivalent of a

lawsuit -- whether they were examples of "polite but puissant compulsion" by a state agency.  To do so, reference to the factors considered in Zecco will be helpful: (1) "a failure to comply with the letter should itself somehow alter the substantiality of the insured's liability, by making liability more likely or more devastating or by giving rise to some particular penalty"; (2) "letters from governmental entities tend to have more severe consequences than those from private parties"; and (3) "a letter's tone [i]s relevant, insofar as it indicate[s] whether the offer to discuss matters [i]s a polite invitation or one the recipient could not refuse."  Zecco, 938 F. Supp. at 68.

2. Allegations in Suit

In order to trigger the duty to defend, not only must there be a "suit," but the complaint or communication must contain allegations that raise the potentiality of coverage under the applicable insurance policies.  Therefore, if the potentiality is not alleged or the policy does not cover what is alleged, there is no duty to defend.  In addition, a number of possible defenses can be raised that -- if established -- may eliminate any potentiality of coverage.  Liberty Mutual has offered a number of arguments for why the duty was never properly triggered or is excused, assuming the "suit" requirement has been deemed satisfied as to each site.

a. <u>Pollution Exclusion</u>

Liberty Mutual policies in effect after 1971 contain some form of endorsement excluding certain types of pollution from coverage. The so-called standard pollution exclusion clause limits coverage under the given policy for damage resulting from

> the discharge, disposal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(1982 Standard Policy Jacket, Defs.' App. XIII, at 152.)[3]

In taking up the question of the pollution exclusion under Maryland law, "the threshold issue is whether the pollution exclusion is part of the Policy." <u>Icarom, PLC v. Howard County</u>, 981 F. Supp. 379, 390-91 (D. Md. 1997) (applying Maryland law to the interpretation of a CGL policy). If it is implicated, the analysis turns to whether the alleged pollution is "sudden and accidental." In the cases addressed herein, Black & Decker does not dispute that the policies in place after July 1, 1971 contained a pollution exclusion.[4] Rather, Black & Decker

---

[3]In <u>Millipore Corp. v. Travelers Indem. Co.</u>, 115 F.3d 21 (1st Cir. 1997) the First Circuit recognized that this "standard" pollution exclusion was generally in effect in the insurance industry from 1970 to 1985. <u>Id.</u> at 27.

[4]Black & Decker does argue that an umbrella excess liability policy was in place from 1970 until 1973 that did not contain the pollution exclusion.

attempts to show that there were "sudden and accidental"
discharges sufficient to require Liberty Mutual to defend and
indemnify even under policies containing the pollution exclusion.

  i.  Sudden and Accidental

   The Maryland Court of Appeals explained its approach to the
"sudden and accidental" exception to the pollution exclusion in
American Motorists Ins. Co. v. ARTRA Group, 338 Md. 560 (1995).
The American Motorists court followed "the interpretation . . .
adopted in numerous other cases . . . on which Bentz[v. Mutual
Fire, Marine & Inland Ins. Co., 83 Md. App. 524 (Md. App. 1990)]
relied." Id. at 587.  Unlike its interpretation of the term
occurrence or accident, where it is the damage that must be
unexpected, the Bentz court "further clarified that . . . the
exception only applies when the discharge, rather than the injury
resulting from the discharge, is sudden and accidental."
American Motorists, 338 Md. at 583 (citing Bentz, 83 Md. App. at
538).  The terms "sudden and accidental" were deemed to be
unambiguous terms by the court, with 'accidental' implying
something unintended and 'sudden' being an event that "was more
or less instantaneous." Id. at 583-84 (quoting Bentz, 83 Md.
App. at 540).

   As such, the exception "does not apply to gradual pollution
carried out on an ongoing basis during the course of business."
Id. at 586.  Certainly, discrete events that are "sudden and

accidental" comprise such gradual pollution.  That, however, does

not render them automatically excepted.  As the court in <u>Ray</u>

<u>Industries, Inc. v. Liberty Mut. Ins. Co.</u>, 974 F.2d 754 (6th Cir.

1992), quoted by <u>American Motorists</u>, pointed out:

> [The insured] has argued that each release was sudden, when
> viewed in isolation.  But under this theory, <u>all</u> releases
> would be sudden; one can always isolate a specific moment at
> which pollution actually enters the environment.  Rather
> than pursuing such metaphysical concepts, we choose to
> recognize the reality of [the insured's] actions in this
> case.

<u>Id.</u> at 768-69 (emphasis in original).  Therefore, in <u>American</u>

<u>Motorists</u>, where "[t]he allegations . . . clearly show that the

claim is based on a pollution problem alleged to have resulted

from the cumulative effects of numerous releases which occurred

on an ongoing basis as part of the regular course of business

over a long period of time" the exclusion will apply.  <u>American</u>

<u>Motorists</u>, 338 Md. at 592.

Again, it is the damage, not the constituent acts, that must

occur suddenly and accidentally and, in cases such as <u>American</u>

<u>Motorists</u> and the cases before me, it cannot be said that the

sites were "polluted 'suddenly' but rather [were] polluted over

the course of several years."  <u>Id.</u> at 593.  Therefore, in order

to find a potentiality of coverage during policy years where a

pollution exclusion is in effect, there must be allegations of

sudden and accidental pollution that is in some way an

appreciable and distinct source of the damage at the site as

alleged in the underlying complaint.  "Mere speculation . . . that any individual instance of disposal, including leaks, occurred 'suddenly' cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental' occurrence."  A.J. Johnson & Co. v. Aetna Cas. and Sur. Co., 933 F.2d 66, 75 (1st Cir. 1991) (quoted by American Motorists, 338 Md. at 589).  In sum, while allegations based on long-term pollution occurring in the normal scope of business implicates the "occurrence" language in the policy, it does not trigger the "sudden and accidental" exception to the pollution exclusion.

If one assumes that the pre-1970 policies, for which I have found material issues of fact remain, do not contain a pollution exclusion, an inquiry into whether events prior to 1970 were "sudden and accidental" for purposes of the exception to the exclusion would be unnecessary.  These events would constitute occurrences under the policies.  Black & Decker, however, cites such occurrences as examples of sudden and accidental events warranting coverage under post-1971 policies.  For instance, Black & Decker contends that an alleged fire in 1953 at the Huth site caused sudden and accidental damage for which they may be liable and for which they are owed a defense and indemnification from Liberty Mutual under policies containing the pollution exclusion.

As I have observed with respect to Massachusetts law, an insured may be entitled to coverage for damage that it concededly could not have caused, if the statute creating liability imposes liability without regard to causation, because a retroactive strict liability statute can make an insured liable for damage that happened before the insured was even involved with the site. And as the Fourth Circuit recently summarized:

> CERCLA "generally imposes strict liability on owners and operators of facilities" from which hazardous substances were released, and it authorizes civil actions against certain statutorily-defined "responsible parties" to recover the costs incurred in cleaning up hazardous waste disposal sites. Significantly, any party incurring response costs consistent with the statutorily-mandated and EPA-created National Contingency Plan ("NCP") is authorized to seek recovery of those costs from other potentially responsible parties by way of a CERCLA cost-recovery claim.

S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co., 372 F.3d 245, 251 (4th Cir. 2004) (citations and footnote omitted).

By this reasoning, an insured is entitled to coverage if it can show that an occurrence that would fall within the policy was responsible for an appreciable portion of the damages the insured was required to pay. This is true even if the insured's activities at the site could not possibly have had any factual connection to the incident; the focus is on how the statute assigns liability, not what actually happened at the site. See 1325 "G" St. Assocs. v. Rockwood Pigments NA, Inc., 2004 WL

2191709, at *4 (D. Md. Sep. 7, 2004) (noting that "[b]ecause of
the statutory strict liability scheme" plaintiffs do not normally
have to prove causation).

It is not necessary, however, to determine here whether
Maryland courts would find coverage under a pollution exclusion
policy for damage caused by a "sudden and accidental" event
predating such a policy.  As will be discussed below, the events
cited by Black & Decker in an attempt to avoid the exclusion do
not warrant a finding that the underlying allegations relate to
anything other than long-term, gradual damage at these sites.  To
the extent that Maryland would apply the exception to the
exclusion based on events prior to coverage, as Massachusetts
does, it cannot be said that any damage caused by these events
form an appreciable portion of the liability at issue, at least
not as it is alleged.  There has to be some reasoned limit on how
far the duty to defend extends.  That the complaints raise
standard, long-term pollution claims appears clear at this stage.
And, to the extent Black & Decker claims the events are
"occurrences" under pre-1970 policies, these arguments are
insufficient -- in light of my findings regarding pre-1970
policies -- to form a basis for summary judgment.

iii.  Deletion Endorsement and Regulatory Estoppel

The standard pollution exclusion clause is often modified by
an additional endorsement which eliminates the applicability of

-18-

this exclusion for "operations or occurrences" in certain
jurisdictions, including Maryland. (See, e.g., 1974-79 USM CGL
Policies, Pl.'s App. 1D, Tabs 1-5; 1971-78 Black & Decker CGL
Policies, Pl.'s App. 2A, Tabs 2-7.)  Black & Decker contends that
the deletion endorsement precludes application of the pollution
exclusion clause to claims involving waste produced in a
"deleted" state, regardless of whether the release of the
environmental contaminants occurred in that state.  Liberty
Mutual argues that the release of the pollutants must take place
in one of the specified states in order for the deletion to
apply.

In Nashua Corp. v. First State Ins. Co., 420 Mass. 196
(1995), the Supreme Judicial Court of Massachusetts declared that
"the endorsement does not apply, and . . . the pollution
exclusion clause remains in effect as to the releases" that occur
outside of the state.  Id. at 201.  Whether Maryland would apply
the same rule is not entirely clear.  In fact, not a single
Maryland case could be found that referenced the term "deletion
endorsement."  The federal district court for the District of
Maryland, however, had this to say about a provision "waiving the
pollution exclusion":

> The relevant language stated that the waiver of the
> pollution exclusion was "applicable in the states of
> Maryland, New Hampshire, North Carolina, and Vermont."  The
> question is whether the words "applicable in" refer to the
> place of issuance of the policy, which was undoubtedly
> Maryland, or to the place where the acts of pollution

occurred.  Although Maryland law does not encourage a court
to comb a policy for ambiguity, it does require that, once
ambiguity is found, it be treated as a question of fact and
that the fact-finder should resolve the ambiguity against
the insurer.  It would appear to the Court that the policy
language is ambiguous.  Because, however, the losses in
question are not covered as "occurrences," the Court need
not resolve this issue.

Alcolac Inc. v. St. Paul Fire and Marine Ins. Co., 716 F. Supp.

1541, 1545-46 (D. Md. 1989) (emphasis added).  As required by

Maryland law, I must strive to give words in the policies their

ordinary meanings.  Only if there is ambiguity may I turn to

extrinsic evidence.

As an initial matter, there is an important language

difference between "applicable in" and "operations or

occurrences."  I find that "applicable in" is ambiguous in

regards to an insurance policy provision in a way "operations or

occurrences" is not.  The waiver provision itself may be

referenced by the word "applicable" while the phrase "occurrence

or operations" is most reasonably interpreted as relating to

activities, not policy provisions.  Therefore, the brief

treatment by the Alcolac court is of only minimal assistance.

Turning to the policies here, Black & Decker contends that

because the deletion applies to "operations or occurrences" that

it would not make sense to limit it to the occurrences alleged in

remote states and not apply it to what it contends are the

originating operations in Maryland.  That is not so clearly the

case.  The word "or" can be a method of equating or defining
terms.  It may also serve to relate concepts, consolidating all
sorts of events in a particular geographic location, i.e.,
Maryland -- a conclusion consistent with the assumed purpose of
such a deletion.  The Maryland deletion would address, by this
reasoning, occurrences as well as operations that pollute the
jurisdiction's soil.  Maryland's interest, one would assume, is
in aiding the clean-up of property within its own borders, not in
remote places with only the most tenuous connection to the state.

If I were to apply the reasoning offered by Black & Decker,
there would be little limit on the application of such a
deletion.  Would any product that had some connection to Maryland
that ended up involved in a site elsewhere become the linchpin
for application of the deletion endorsement?  Only a strained
interpretation of the language would permit such a conclusion.

Black & Decker relies upon Nat'l Union Fire Ins. Co. v. CSX
Corp., 982 F. Supp. 1050 (D. Md. 1997),[5] for the proposition that
"operation" is -- at a minimum -- ambiguous under Maryland law,
adding that this is "a conclusion consistent with an earlier

---

[5]In its citation to this decision, Black & Decker included
that it was vacated on other grounds.  In fact, the Fourth
Circuit vacated the opinion because "the district court erred on
remand by not considering the railroad operation exclusion in the
lower level policy, which the parties agree is the applicable
policy.  The court further erred in failing to resolve the
factual issue that is central to the coverage question--whether
CSX's actions involved the operation of a railroad." 155 F.3d 560
(table) (4th Cir. 1997).

decision of the Fourth Circuit in the same case."  In that earlier case, the Fourth Circuit addressed a railroad liability exclusion that excluded coverage arising out of the "operation . . . of a railroad."  <u>See</u> 131 F.3d 135 (table), 1997 WL 770608, at **2 (4th Cir. Dec. 11, 1997).  To answer the question, the district court was instructed to not only look at the nature of the accident, but also to examine the nature of the alleged wrongdoing by the insured.  Because the language was ambiguous, the district court would have to resolve the question by reference to extrinsic evidence, evidence revealing a "factual dispute" in that case.  Although it might seem like splitting hairs, the dispute there, in light of the opposing evidence, related to railroads, not operations.  There would need to be expert testimony and opposing evidence regarding whether certain activities constituted railroad activities.

Here, on the other hand, the dispute is over the proper interpretation of the word "operations."  There is no substantive dispute relevant to this issue, it seems, about what in fact Black & Decker's actions were, only whether they were "operations" for purposes of the deletion rather than the "operation of" a certain category of business.  In the absence of clear direction from Maryland courts, I find the <u>Nashua</u> approach the most reasonable and conclude that "operations or occurrences" refers to the site of the damage, not the source state of the

material.

Looking beyond the mere deletion endorsement and returning to the pollution exclusion that it deletes further supports such an interpretation.  The exclusion applies to "bodily injury or property damage arising out of" the discharge or release of pollutants.  While the courts of Maryland have interpreted "arising out of" broadly, see Beretta U.S.A. Corp. v. Fed. Ins. Co., 17 Fed. Appx. 250, 2001 WL 1019745, at **4 (4th Cir. Sep. 6, 2001), the phrase is qualified by a number of words that tie the language to the site of pollution, not the original source of the pollutants.  The deletion declares that this language "does not apply to operations or occurrences" in Maryland,[6] assumedly referencing the acts listed in the exclusion -- "discharge, dispersal, release or escape" of pollutants "into or upon land, the atmosphere or any watercourse or body of water."

In sum, the exclusion does not refer to injury "arising out of" pollutants, but rather "arising out of" the dispersal of those pollutants.  The exclusion and the deletion relate to pollutants entering the soil; here, soil not in Maryland. Therefore, looking at the exclusion and deletion together, the interpretation of "operations or occurrences" becomes easier. Whatever these terms mean, they clearly relate to activities

_____

[6] Likewise, the exception to the exclusion for "sudden and accidental" dispersals uses the same "does not apply" language as the deletion.

-23-

otherwise excluded, here, the dispersal of pollutants, not the shipping of them out of state.

To find otherwise would be to declare that the exclusion "does not apply" to activities it never applied to in the first place. I find therefore that the deletion is unambiguous (1) in light of Maryland's approach to interpreting insurance policies as a whole and the language's plain meaning; (2) given the lack of any apparent factual dispute relevant to this question that would create ambiguity in interpreting the language; and (3) in the absence of any evidence indicating a different intent by the parties or technical meaning for the words at issue. See J.E. Meintzer & Sons, Inc. v. Nationwide Mut. Ins., No. HAR 91-353, 1992 WL 12994, at *1 (D. Md. Jan. 14, 1992) ("[T]he question before this court is 'one of the construction of the contract in light of the language employed in the contract, the subject matter and the surrounding circumstances. When these are clear, it is the province of the court, rather than of the jury, to construe the contract.'") (citing Consumer Life Ins. Co. v. Smith, 86 Md. App. 570 (1991) (quoting Ebert v. Millers Fire Ins. Co. 220 Md. 602, 610 (1959)). I predict that Maryland courts, if ever faced with this precise question, will resolve it in the same manner

    b. Occurrence

During those time periods not covered by the pollution

exclusion, the complaining papers still must contain some allegation that a covered occurrence[7] took place for the duty to defend to be triggered.  See Sheets, 679 A.2d at 543 (requiring, in order to trigger the duty to defend, that the "complaint at least alleged three independent elements . . . : (1) that there was 'property damage' as defined in the policy; (2) that the property damage was 'caused' by the negligent misrepresentation; and (3) that negligent misrepresentation is an 'occurrence' as that term is defined by the policy").  Here, the question is

---

[7]The principal coverage language in the Liberty Mutual policies limits recovery to liability arising from bodily injury or property damage caused by a certain class of events.  Based on testimony and policy jackets in the record, it appears that prior to 1966, that class of events was simply referred to as an "accident."  (E.g., 1962 Standard Policy Jacket, Defs.' App. XIII, at 115.)  After 1966, Liberty Mutual's standard jackets begin to refer to this class of events as an "occurrence."  (E.g., id. at 121.)  The change from accident to occurrence does not appear to be substantial, given the similarities between interpretations of the terms "accident" and "occurrence."  See New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162, 1196 (3d Cir. 1991) (describing history of coverage terms including shift from "accident" to "occurrence"), cert. denied, 507 U.S. 1030 (1993), and abrogated on other grounds, N. Ins. Co. of N.Y. v. Aardvark Assoc., Inc., 942 F.2d 189 (3d Cir. 1991); Metro. Life Ins. Co. v. Aetna Cas. & Sur. Ins. Co., 255 Conn. 295, 306 n.14 (2001) ("accident" and "occurrence" used interchangeably); Lane v. Worcester Mut. Ins. Co., 13 Mass. App. Ct. 923, 923 (1982) (looking to decisions interpreting "accident" to determine proper interpretation of "occurrence").

Moreover, standard language in occurrence-based policies defines occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (E.g., 1966 Standard Policy Jacket, Defs.' App. XIII, at 123.)  The term "accident" is generally not defined in "accident"-based policies.  Given these similarities, the cases interpreting occurrence-based coverage policies are also highly probative of earlier accident-based policies.

whether the delivery of waste materials from Maryland to the
three sites covered by Maryland law which later were found to
have contaminated the property over the course of many years are
covered occurrences.  I find that under Maryland law they are
and, therefore, that allegations that they occurred will trigger
a duty to defend on the part of Liberty Mutual.

Although Maryland has refused to take a severely narrow view
of the terms "accident" and "occurrence" in insurance policies,
it has been less than clear in its delineation of the
definition's boundaries.  As early as the decision in
Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc., 248 Md. 148
(1967), the Maryland Court of Appeals found that "the fact that
an injury is caused by an intentional act does not preclude it
from being caused by accident if in that act, something
unforeseen, unusual, or unexpected occurs which produces the
event."  Id. at 151-52; see Cole v. State Farm Mut. Ins. Co., 753
A.2d 533, 540 (Md. 2000).  The Harleysville court found for the
insurer, concluding that "a contractor who piles trees and
underbrush in 10 to 12 foot piles, adds fuel oil and rubber
tires, and permits the fires to burn for 36 hours before they are
extinguished should be charged with the responsibility of
foreseeing that a pall of smoke and soot will result, which may
damage adjacent properties."  Harleysville, 248 Md. at 154.

After Harleysville questions remained.[8]  The most important being what standard to apply:  Must the event be objectively or subjectively unforeseeable in order to be covered by a CGL policy?  The Cole court -- addressing the issue in the context of intentional torts -- described the holding in Harleysville as being based on the finding that "the contractor should have foreseen the potential for the resultant damage."  Cole, 753 A.2d at 539 (emphasis added).  This implies an objective standard.  The court proceeded, however, to cite a more recent opinion, Lincoln Nat'l Life Ins. v. Evans, 943 F. Supp. 564 (D. Md. 1996), that laid out a "two-part test to determine whether Mr. Hawkins should have expected, subjectively or objectively, that his wife would kill him."  Cole, 753 A.2d at 542 (emphasis added).

In Sheets, the Maryland Court of Appeals applied a policy provision analogous to the one at issue here: "The policy defines 'occurrence' as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions,' but does not define 'accident.'  The policy also excludes from coverage property damage 'expected or intended from the standpoint of the "insured."'"  Sheets, 679 A.2d at 545.  The

_____

[8]The first, namely, from whose perspective must the event be unforeseeable, has been resolved by Maryland courts.  As described in Cole, the perspective to take is that of the insured.  That does not resolve, however, whether the perspective is of the particular insured or of an objectively reasonable insured.

court took up the question of whether an alleged act of negligent misrepresentation was a covered accident, and found that "when a negligent act causes damage that is unforeseeable or unexpected by the insured, the act is an 'accident' under a general liability policy." Id. at 548.

The court in Sheets found that general liability "insurance policies would be rendered all but meaningless" if it were to apply an objective standard to the term "accident" and "hold that the term . . . excludes coverage for damage that should have been foreseen or expected by the insured." Id. at 549 (emphasis in original). The court explained that if the negligent act was objectively foreseeable, the insured would be liable for the damage but not covered. If the damage was not objectively foreseeable, the insured is not liable but is eligible for coverage.

Despite this apparently clear adoption of an objective standard, the court in Cole found that "[t]he test applied by the court in Lincoln Nat'l Life Ins. strikes us as essentially a more detailed version of the analytical approach we most recently employed in Sheets." Cole, 753 A.2d at 542. The court added, however, that "[s]pecifically, and most germane to the case at hand, the test analyzes in detail and in a logical sequence the events of an intentional tort from the perspective of an insured who is also the victim of the intentional tort." Id. Here, on

the other hand, the insured -- Black & Decker -- is not the
victim of the accident, but rather is the actor, much like in
Sheets.

In the end, the Cole court was "not convinced by
Respondent's assertion that the term 'accident' is susceptible to
only one meaning" and "[b]ased on the ambiguity . . . construe[d]
the term . . . against the drafter of this insurance contract and
in favor of the insured." Id. at 544.  If the policies here were
the same as those construed in Cole, I might take the same path
to that conclusion.  Here, however, the insurance policies are
more clear, not simply providing that the acts must occur by
accident, but adding that covered events include "continuous or
repeated exposure to conditions, which results in bodily injury
or property damage neither expected nor intended from the
standpoint of the insured."  The contractual language itself
mandates a subjective analysis of the insured's state of mind.

Liberty Mutual, in maintaining that the occurrences alleged
at the sites governed by Maryland law are not covered, cites
Lerner v. Assurance Co. of Amer., 707 A.2d 906 (Md. App. 1998) in
addition to Sheets.  Liberty Mutual contends that the
contamination at issue here was caused by routine business
operations and cannot be deemed an accident.  It attempts to
further this argument in their Supplemental Brief Regarding
Excess Liability Policy ("Pl.'s Supp. EL Brief"), adding

citations to a federal district court opinion, <u>Alcolac Inc. v.
St. Paul Fire and Marine Ins. Co.</u>, 716 F. Supp 1541 (D. Md.
1989), for the proposition that "when pollutants regularly have
escaped over a period of years, especially when management was
either deliberately indifferent to the situation or consciously
disregarded it, coverage is excluded under the policy definition
of 'occurrence', because damage is to be expected, with a
substantial degree of probability."  <u>Id.</u> at 1544; <u>see</u> Pl.'s Supp.
EL Brief, at 12-13.

    As an initial matter, and as Black & Decker points out,
<u>Alcolac</u> was deciding the issue of the duty to indemnify in a case
where a jury had already imposed punitive damages on the
polluter.  And, although the court did find that the "continuing
acts of pollution" would not be covered, it added that "the
management's efforts to deal with the problem either amounted to
conscious disregard or deliberate indifference."  <u>Alcolac</u>, 716 F
Supp. at 1544.  Finally, the Maryland Court of Special Appeals,
in <u>Lerner v. Assurance Co. of Amer.</u>, 707 A.2d 903 (Md. App.
1998), had an opportunity to apply the reasoning of <u>Sheets</u>, but
before doing so, it summarized the Court of Appeals decision in
<u>Bausch & Lomb, Inc. v. Utica Ins. Co.</u>, 330 Md. 758 (1993):

> Bausch & Lomb affirms the proposition that coverage under a
> CGL policy is triggered only when an "occurrence" results in
> "property damage" to a third party.  Although the Court
> determined that the accidental long term release of
> chemicals into the soil and ground water may constitute an
> "occurrence," it found that coverage was not provided

because the "occurrence" did not cause any damage to a third
party.

Lerner, 707 A.2d at 911.

Likewise, applying Maryland law, the court in Icarom took up
what the court dubbed the "fortuity requirement." 981 F. Supp.
at 389. Responding to the contention that the insured "expected
and/or intended the pollution damage that occurred," the court
made its "determination . . . based on the actual awareness of
the insured at the time the coverage was obtained." Id. at 390.
"While [the insured] admittedly knew of the dangers associated
with the pollutants and contaminants present in its landfills, it
simply does not follow that it intended, expected or foresaw that
pollution damage ultimately would occur." Id. (emphasis in
original).

In sum, even if I were to apply some variant of the combined
objective/subjective test laid out in Lincoln Nat'l Ins. Co., I
cannot say that Black & Decker knew or should have known at the
time it obtained the policies at issue that the waste they had
transported to these remote facilities was highly likely to cause
property damage of the sort alleged. In any event, I find, in
light of the cases discussed above, that Maryland courts would
apply a subjective standard to a case of a CGL policy for
property damage to a third-party. Therefore, to the extent the
underlying allegations raise potential liability for parties who
transported waste products to a remote recycling or reclamation

facility during a covered period, such acts will be deemed
occurrences for purposes of outlining the duty to defend.

### c. Delay and Failure to Cooperate

The issue of potentially prejudicial delay in notification
by Black & Decker is implicated in these cases as well.
Historically, even if notification of a claim was not an explicit
condition of coverage in the policy terms, "the duty of
notification was regarded as creating a condition precedent to
the insurer's obligation to defend or indemnify, and the lack of
any prejudice to the insured from the failure to give prompt
notice was immaterial." Sherwood Brands, Inc. v. Hartford
Accident and Indemnity Co., 698 A.2d 1078, 1082 (Md. 1997). That
approach was modified by statute in Maryland. The relevant
provision now states:

> An insurer may disclaim coverage on a liability insurance
> policy on the ground that the insured or a person claiming
> the benefits of the policy through the insured has breached
> the policy by failing to cooperate with the insurer or by
> not giving the insurer required notice only if the insurer
> establishes by a preponderance of the evidence that the lack
> of cooperation or notice has resulted in actual prejudice to
> the insurer.

Md. Code Ann. § 19-110.

In sum, the Sherwood court explained, "[i]n order to avoid
its duty to defend or to indemnify on the ground of delayed
notice, the insurer must establish by a preponderance of the
evidence that the delay in giving notice has resulted in actual

-32-

prejudice to the insurer." <u>Sherwood</u>, 698 A.2d 1083.  Therefore,
the duty to defend may arise before notification, as may the
requirement to indemnify for those costs:

> We conclude that . . . the duty to defend arises when an
> insured claim is filed or insured occurrence happens, but
> that . . . duty is not breached, and thus no action will lie
> for its breach, until the insurer is apprised of the claim
> or occurrence and thereafter, without legal justification,
> fails to undertake a defense in accordance with its
> obligation.

<u>Id.</u> at 1085.  This principle will be fleshed out further in
discussing its application to the Huth and Berks claims.

**B. <u>Duty to Indemnify</u>**

As with the duty to defend, the duty to indemnify contained
in the various Liberty Mutual policies has remained, with limited
exceptions, essentially unchanged throughout the decades at
issue.  The pertinent language in these policies provides
property damage and bodily injury coverage to the insured for
"accidents" or "occurrences" that take place during the policy
period and for which the insured is liable under law or contract.
Such general policy coverage is often modified through
endorsements to the policy that contain coverage exclusions and
monetary limits.

The duty to indemnify is more narrow than the duty to
defend.  <u>See</u> <u>Walk v. Hartford Cas. Ins. Co.</u>, 382 Md. 1, 15
(2004).  "Under the typical liability insurance policy, the

insurer has a duty to indemnify the insured, up to the limits of the policy, for the payment of a judgment based on a liability claim which is covered," <u>Mesmer v. Maryland Auto. Ins. Fund</u>, 353 Md. 241, 257 (1999), while, as already noted, the duty to defend is triggered by the simple potentiality of coverage.

Here, the duty to indemnify is only implicated at the BROS and Huth sites.  The question before me would normally be whether such costs may be considered legal obligations to pay for liability covered by applicable policies.  Liberty Mutual, however, does not offer clearly distinct arguments regarding the duty to indemnify at these sites.  In light of that posture, I find that to the extent the duty to defend was triggered as to a site, the duty to indemnify was as well for purposes of the instant motions.

**IV. <u>Sites</u>**

    **A. <u>Bros</u>**

        1. <u>Overview</u>

The Bridgeport Rental and Oil Services ("BROS") site is a waste oil processing and reclamation facility in Bridgeport, New Jersey.  (Defs.' Answers to First Interrogs., Tier I App., at 1; BROS Compl. ¶¶ 33-38, Defs.' Vol. XXVIII, at 86-87.)  From approximately 1950 through 1980, the BROS site accepted waste oil

and other hazardous substances from numerous sources, collecting it in a large thirteen acre "lagoon" system. (BROS Compl. ¶¶ 38-42.)

In 1992, several private plaintiffs brought an action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") against defendants who allegedly transported waste to the BROS site or generated waste that was transported to it. (See id.) Among the defendants was A & A Waste Oil Company, Inc. ("A&A"), a Maryland corporation that apparently transported waste oil produced by Black & Decker to the BROS facility from approximately 1973 to 1979.[9] (See BROS Compl. ¶ 30; BROS Settlement Proposal, Defs.' Vol. XXVIII, at 79; Deposition of Hoaward J. Goldstein (Goldstein Dep.), at 7-15, Defs.' Vol. XXIX, at 24-26; Defs.' Answers to First Interrogs., Tier I App., at 3.) On December 17, 1992, the defendants received notice to participate in a court-sponsored settlement of the CERCLA action based on their status as an alleged generator of waste transported by A&A to the BROS site. (BROS Settlement Proposal, Defs.' Vol. XXVIII, at 79.) Black & Decker claims that

_____

[9]It is unclear the length of time that A&A transported oil waste for Black & Decker. In their answers to interrogatories, the defendants claim that any such transportation must have occurred between 1973 and 1979. (Defs.' Answers to First Interrogs., Tier I App., at 3.) In their memorandum of law, they argue that A&A began transporting waste oil "at least by the late 1960's." (Defs.' Mem., at 135.) The plaintiff claims in its memorandum that the defendants "conceded" that A&A picked up waste oil from them from 1973 to 1982. (Pl.'s Mem., at 152.)

as of the time of the filing of the summary judgment motions, it paid $5,492.87 in remediation costs in addition to defense costs with respect to the BROS site, and that they subsequently incurred additional costs. (Defs.' SOF, BROS ¶¶ 11-12, at 17.)

    2. <u>Issues Presented</u>

Liberty Mutual argues that there was no "suit" triggering their duty to defend or indemnify. (<u>See</u> Pl.'s Motion and Supporting Mem. for Summ. J. ("Pl.'s Mem.").)  It also contends that none of the policies it issued to Black & Decker prior to 1973 are implicated at this site "because the BROS Settlement Process Committee . . . has only 'alleged or "determined" that Black & Decker's waste oil was transported to the BROS Site during" time periods falling somewhere between March of 1973 and July of 1979.  (<u>See</u> <u>id.</u> at 153 (quoting Defs.' Int. Responses, Tier I App., at 3).)  Finally, Liberty Mutual argues that, at a minimum, Black & Decker may not recover for policies covering the period from July 1, 1971 to July 1, 1979 because of an applicable pollution exclusion because there was no "sudden" or "accidental" pollution that would fall outside the exclusion at the BROS site.

Black & Decker contends that there is extrinsic evidence indicating that A&A was delivering waste oil to BROS as early as 1959 and began picking up oil from Black & Decker in the late 1960's.  (Defs.'s Mem. in Support of Mot. for Partial Summ. J. ("Defs.' Mem."), at 135.)  "Accordingly, whether the duty to

defend is based upon the underlying claim or upon a record
supplemented by extrinsic evidence, that duty arises under
policies issued before the pollution exclusion was added to Black
& Decker's CGL policies." (Id.)  In addition, the defendant
points to a leak occurring at the site that was sufficiently
"sudden" and "accidental" to remove it from the pollution
exclusion.  Black & Decker also claims that a Maryland deletion
requirement prevents the application of the pollution exclusion
in any event.  (Id. at 136.)  Finally, Black & Decker argues that
an umbrella excess liability policy for the period July 1, 1970
until July 1, 1973 provides a duty to defend and does not contain
the pollution exclusion.

   3. <u>Analysis</u>

   Liberty Mutual contends that the letter received by Black &
Decker from private counsel, William H. Hyatt, (<u>see</u> Pl.'s Renewed
BROS Sub., Tab 15c. ("Hyatt Letter")), was not a "suit"
triggering the duty to defend.  As discussed above, the initial
question is whether the letter was the functional equivalent of a
lawsuit for purposes of triggering the duty.

   In regard to the law as applied in Massachusetts, I did
find, as Liberty Mutual asks me to do here, that it has "no duty
to defend any insured that was not itself sued."  That language,
however, related to a private demand letter from a non-insured to
an insured for indemnification.  Here, the letter, although from

a private party, does not relate to a separate contractual
obligation to indemnify, but rather implicates liability for
property damage as covered by the Liberty Mutual insurance
policies.  Therefore, the dispositive question is not whether
Black & Decker was formally sued, but whether the letter at issue
here was the functional equivalent of a suit.  I find that it was
not.

I return to the factors delineated by Zecco as a helpful
organizing approach to this question: (1) "a failure to comply
with the letter should itself somehow alter the substantiality of
the insured's liability, by making liability more likely or more
devastating or by giving rise to some particular penalty"; (2)
"letters from governmental entities tend to have more severe
consequences than those from private parties"; and (3) "a
letter's tone [i]s relevant, insofar as it indicate[s] whether
the offer to discuss matters [i]s a polite invitation or one the
recipient could not refuse."  Zecco, 938 F. Supp. at 68.

Turning to the first factor in Zecco, there are potential
consequences to ignoring the letter.  Enclosed with the Hyatt
Letter was a "Certificate of Commitment to Participate in
Informal Discovery and Settlement Negotiations."  That form was
"to be signed and returned no later than January 13, 1992," with
the added (underlined and bold) note "that the December 12, 1992
date contained in . . . of [the court management order] is

-38-

expected to be changed by Judge Rosen to January 13, 1992."
With that said, the letter did not purport to say that failure to
participate would <u>automatically</u> result in joinder, nor did it
declare that failure to sign would be the equivalent of rejecting
settlement.  (<u>See</u> <u>id.</u> (noting that "if and when" the recipients
of the letter are joined "such as might be the case if you elect
not to participate").  Because the letter notifies the recipients
of an upcoming meeting where the issues raised in the letter will
be discussed and provides an update on the proceedings in the
underlying cases, ignoring it arguably creates no risk of
liability or penalty.  Not until the meeting, and the choice to
participate is formally requested, might the real risks be
incurred.  The letter appears, at most, to be evidence that Black
& Decker was notified of a choice -- take part in the settlement
process or risk being joined as a defendant.  It cannot be said
that this constituted the functional equivalent of a lawsuit or
replicated "the authority given to EPA under" CERCLA.  <u>Michigan</u>
<u>Millers Mut. Ins. Co. v. Bronson Plating Co.</u>, 445 Mich. 558, 574
n.13 (1994), <u>overruled on other grounds</u>, <u>Wilkie v. Auto-Owners</u>
<u>Ins. Co.</u>, 469 Mich. 41 (2003).

Turning to the factor of the letter's source, a letter from
a private party generally does not imply the same level of
compulsion as does a communication from the government.  The
letter at issue here, however, is not simply a communication

between one private party and another.  Although it does not in any way reach the level of a court order, the letter apparently was written as part of an effort by the judge and parties in the underlying action to efficiently structure the cases.

The judge in the underlying actions had entered a case management order, that "establishe[d] a dual case management approach utilizing simultaneous litigation and settlement tracks."  It was in "fulfill[ing] the requirements" of that order that Mr. Hyatt extended the invitation to participate in the settlement track.  (See Hyatt Letter ("I have been asked on behalf of the Rollins plaintiffs and the Allied-Signal defendants, to transmit this letter and accompanying materials to you in compliance with the requirements of [the court management order].")  That Mr. Hyatt acted as a conduit for that information does not, in itself, turn the letter into something without real consequences.  But the letter must have consequences commensurate to the filing of a suit, which has not been established here.

Finally, the language used in the letter should be considered.  Two of the purposes listed at the outset are "to advise . . . of recent developments in the litigation" and "to invite [Black & Decker] to participate in a voluntary, informal, non-litigated settlement/mediation process."  Relying on these phrases in isolation, however, would be overly formalistic.  The letter provides indications of urgency and compulsion.  The first

word under the letterhead is "important", printed in all caps,
underlined, and followed by an exclamation point.  Beneath that,
also in bold and all caps, is the phrase "please read
immediately."  Black & Decker was invited to participate "in lieu
of joinder as a defendant in one or both of the pending cases."
But these predictions regarding joinder are, in essence,
descriptions by a private party -- admittedly involved in the
process -- of facts.  This does not establish the type of
formality or imminence implicit in lawsuits or dealings with the
government.

In the end, considering the evidence in the light most
favorable to Black & Decker, I cannot find that the Hyatt Letter
-- the communication on which it relies in making its arguments
-- is the functional equivalent of a lawsuit.  Despite the
deadline listed and the possibility of joinder it describes, the
letter received from Mr. Hyatt providing notice of the procedures
in place to resolve the underlying actions to which Black &
Decker could potentially be a party cannot be said to be the
functional equivalent of a lawsuit.  As Judge O'Toole noted in
Zecco, "[t]he failure to respond to the EPA's PRP letter in Hazen
was equivalent to ignoring a suit filed by the EPA. [The
insured's] failure to respond here would not have exposed it to
similarly drastic consequences . . ."  Zecco, 938 F. Supp. at 69.

The fact that Black & Decker was able to withdraw without

being joined is probative of Liberty Mutual's contention that no such consequence ever materialized in such a way as to constitute the functional equivalent of a suit.  Black & Decker has failed to demonstrate how the threat referenced in the letter became imminent.  I therefore find, assessing the evidence in the light most favorable to Liberty Mutual, that the Hyatt Letter provides too tenuous a connection to the underlying actions to warrant a finding as a matter of law that it constituted the functional equivalent of a suit.

Nevertheless, I will take up the remaining arguments in the event their resolution becomes necessary at a later date and because the issues are implicated at the two remaining sites. Liberty Mutual argues that there can be no duty triggered under the pre-1973 policies -- because the only evidence presented connecting Black & Decker to the site relate to events occurring after that date -- nor triggered after that year because of the pollution exclusion.  It contends it is permitted to rely on such evidence presented in conjunction with the underlying claims, citing Northern Ins. Co., 2003 U.S. App. LEXIS 12318.  The court in Northern Ins. Co. noted that

> Maryland recognizes two limited exceptions to the general
> rule against an insurer's use of extrinsic evidence.  First,
> when the underlying tort plaintiff has amended his
> allegations against the insured, the insurer may utilize the
> amendments as extrinsic evidence.  If the amended
> allegations no longer raise a potentiality for coverage, the
> insurer no longer has a duty to defend. As a second

> exception to the general rule, a court is not obligated to
> "turn a blind eye where [it is established] that an insured
> tortfeasor is excluded from coverage under [the] particular
> terms of the insurance policy."  In other words, an insurer
> may utilize uncontroverted extrinsic evidence from the
> underlying lawsuit if such evidence clearly establishes that
> the suit's allegations are beyond the scope of coverage.

Id. at **10.  The first exception clearly does not apply here.

Nor does it amount to a real exception.  To the extent the

complaint is amended, it simply alters the document against which

the insurance policy is compared.

Liberty Mutual relies instead on the second exception,

referencing a Maryland Court of Special Appeals decision,

Universal Underwriters Ins. Co. v. Lowe, 135 Md. App. 122 (Md.

App. 2000).  First, it will be helpful to see just how limited an

exception was applied in Lowe:

> Under the circumstances, it would defy logic to require
> Brethren, at this stage, to defend Ms. Lowe in the Parsons'
> tort action. While Brethren may have had an obligation to
> defend Ms. Lowe prior to the declaratory judgment -- and we
> express no opinion in that regard -- any such obligation was
> extinguished once the trial court determined that coverage
> was excluded under the policy. Cf. Miller, 130 Md. App. at
> 383 (explaining that where the plaintiffs suit involves
> several claims, and "any claims potentially come within the
> policy coverage, the insurer is obligated to defend all
> claims '. . . until such times . . . that the claims have
> been limited to ones outside the policy coverage'" (citation
> omitted)).

Id. at 1013.  This is not such a case, at least not at this

stage.  The evidence offered by Liberty Mutual does not go to the

potentiality of coverage, but rather to the likelihood of success

of the underlying claim under a pre-1973 policy.  Even

"frivolous" and groundless claims trigger the duty to defend.
Liberty Mutual cannot offer the evidence that there were no such
occurrences under the guise of evidence that the complaint cannot
extend to acts prior to 1973.  In fact, nothing in the complaint
would prevent recovery for damage done prior to 1973, nor does
the evidence offered of contact with the site after 1973 preclude
the possibility that events prior to that will be part of the
dispute.  As the letter received by Black & Decker regarding the
underlying actions made clear, the attached documents from the
Settlement Committee "identif[ied] the evidence <u>currently</u>
<u>available</u> linking your company to the BROS Site."  (<u>See</u> Hyatt
Letter (emphasis added).)  Moreover, Black & Decker has offered
evidence of a potential connection, however tenuous, between
itself and the site in years prior to those offered in the
underlying documents.

    The Liberty Mutual argument here might be useful in regard
to the duty to indemnify, but not -- as they offer it -- the duty
to defend.  Liberty Mutual should have made the arguments
regarding the lack of a pre-1973 connection in the defense to
limit possible recovery.  It then could have made similar
arguments to limit its duty to indemnify if it could establish
that no pre-1973 damage was implicated.  If insurers could
successfully make such arguments to avoid their duty to defend,
the duties of defense and indemnification would merge.  It is
simply not the case that there is no potential liability for

damage prior to 1973, however unlikely Liberty Mutual thinks the
evidence makes it appear.

Turning to the pollution exclusion, Black & Decker proffers
two arguments for coverage. First, it claims that there is
evidence of a "sudden and accidental" occurrence. As I discussed
above, however, insureds may not escape the exclusion simply by
finding discrete events that could have damaged the property.
The touchstone is the allegations in the suit and an evaluation
of what the insured may be potentially liable for in light of
those allegations. The underlying complaint did reference a 1964
fire, but that was not alleged to be a source of the pollution.
(See Rollins Compl. ¶ 39, Pl.'s Renewed BROS Sub., at Tab 15a.
("During 1964, a fire destroyed the re-refining processes at the
B.R.O.S. site. Despite the lack of re-refining equipment, wastes
of the United States containing hazardous substances . . .
continued to be sent to the B.R.O.S. site and to be deposited in
part in the lagoon at the site."). The fire appears to further
allegations relating to the dangers of storage of the waste in
the lagoon, not as a basis of it causing the pollution itself.
This alone cannot relieve Black & Decker of the exclusion.

The gist of the complaint relates to the leaching of waste
oil. The occurrence of a fire or of the leak referenced by Black
& Decker does nothing to change the allegations and the potential
liability they raise. As already noted, "[m]ere speculation . .
. that any individual instance of disposal, including leaks,

-45-

occurred 'suddenly' cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental' occurrence." <u>A.J. Johnson</u>, 933 F.2d at 75); <u>see American Motorists</u>, 338 Md. at 589. A reasonable reading here precludes finding that the exception to the exclusion has been established.[10]

Finally, Black & Decker contends that to the extent the pollution exclusion prevents coverage, it should not be enforced until after July 1, 1973, the termination date of a three-year umbrella excess liability policy ("EL policy") that it claims does not include the exclusion. Liberty Mutual initially argued that the EL policy did not provide coverage for otherwise excluded pollution. (<u>See</u> Pl.'s Supp. Brief re: Excess Liability Policy). In their renewed submissions, however, they did not include this memorandum, and in summarizing their present arguments in regard to the BROS site (concerning which this issue was raised during the August 27, 2003 hearing), it relies on the fact that the Settlement Committee offers no evidence of Black & Decker involvement before March of 1973. While it appears that Liberty Mutual may have abandoned its claim that the EL policy

---

[10]Black & Decker also raises the adoption in New Jersey of regulatory estoppel, requesting that the court find that Maryland would follow that approach as well. They provide no authority, beside Maryland's adoption of the deletion endorsement, that would permit me to predict Maryland would proceed in that manner. Maryland law applies to this claim and, therefore, I have applied the deletion endorsement as I predict Maryland courts would.

does not provide coverage that would otherwise be excluded under the policy, it only makes a difference -- assuming a duty were triggered by a potential Black & Decker connection to the site during the 1970-1971 policy year -- for purposes of the duty to indemnify. As noted above, Liberty Mutual does not offer distinct indemnification arguments.

In any event, because I found there was no "suit" triggering the duty to defend, these questions are not dispositive.

**B. <u>Huth</u>**

1. <u>Overview</u>

The Huth Oil Services ("Huth") site in Cleveland, Ohio is a waste oil reclamation facility. The Huth site allegedly operated from approximately 1938 until 1990. (Huth Compl. ¶ 10, Defs.' Vol. XXXII, at 3.) During 1990-1993, several parties participated in the cleanup of the Huth site pursuant to an administrative order by the EPA. (<u>Id.</u> ¶¶ 14-15.) These parties then filed a cost recovery action under CERCLA against three defendants, including Black & Decker, that allegedly produced waste that was disposed at the Huth site. (<u>Id.</u> ¶ 23.) The allegations in the complaint are vague in describing the link between Black & Decker and the Huth site. A ledger page reflects a transaction between Black & Decker and Huth in January 1970. The action settled in November, 2001 with Black & Decker paying $5,000 in alleged remediation costs. Black & Decker alleges that

it incurred attorneys' fees for which it seeks reimbursement from Liberty Mutual.

2. <u>Issues Presented</u>

Liberty Mutual characterizes the alleged property damage at issue at the Huth site as revolving around a single delivery in 1970. (Pl.'s Mem., at 237.) Because, Liberty Mutual claims, the policies after July 1, 1971 contained a pollution exclusion and the contamination at the site was not "sudden" or "accidental", Black & Decker may not recover under its policies. (<u>Id.</u> at 237-38.) Additionally, it contends that there was no "accident" or "occurrence" that would trigger a duty on their part. (Pl.'s Supp. Mem., at 61.) Liberty Mutual also asks the court to find that Black & Decker's delay in notifying them of an opportunity to settle were prejudicial. (Pl.'s Renewed Submission re: Huth Site ("Pl.'s Huth Sub."), at Tab 1.)

Black & Decker responds that because the allegations relate to pre-pollution exclusion events, the pre-pollution exclusion policies are implicated. (Defs.'s Mem., at 166.) Black & Decker also refers to a lightning strike in 1953 that caused damage at the site as a "sudden" and "accidental" occurrence implicating even those policies containing a pollution exclusion. (<u>Id.</u>) Finally, Black & Decker contends that it gave prompt notice to Liberty Mutual.

3. <u>Analysis</u>

I find -- based on Maryland's approach to interpreting

-48-

"occurrence" analyzed above -- that, at the very least, the alleged 1970 delivery of waste materials from Black & Decker to Huth triggers the duty to defend under the 1970-71 policy.  There is no evidence in the record that would permit me to find that Black & Decker subjectively intended to inflict the damage suffered at the Huth site.  In fact, Liberty Mutual does not contend that Black & Decker did, but instead relies on an unpersuasive interpretation of Maryland law regarding the application of the term "occurrence" or "accident" to the activities alleged in the underlying complaint.

As I have found in regard to the Whitman, Massachusetts site, the damage from the ongoing pollution at the Huth site qualifies as an "accident" under the rubric of "continuous or repeated exposure to conditions."  The damage at the site occurred over a long period of time.  The Huth site can accurately be described to have been injured by repeated exposure to conditions resulting from pollution caused by the waste oil reclamation operations at the site.

Moreover, the underlying allegations simply allege a connection between the Black & Decker and the site, and extrinsic evidence shows that waste from Black & Decker delivered to a company tied to the site may have begun long before and continued through at least 1971, the earliest time at which the pollution exclusion would have taken effect.  See Litz v. State Farm Fire and Cas. Co., 695 A.2d 566, 572 (Md. 1997) ("If there is a

-49-

possibility, even a remote one, that the plaintiff's claims could
be covered by the policy, there is a duty to defend."). This is
sufficient to trigger the duty to defend.  Liberty Mutual's
arguments to the contrary are, in essence, the arguments they
should have made on behalf of Black & Decker in furtherance of
its duty to defend.  If Liberty Mutual believes Black & Decker
had no connection to the site, or that a cited connection is
insufficient to trigger liability, that is a defense to mount,
not an argument to use against its insured.[11]  To conclude
otherwise would be to permit Liberty Mutual to "circumvent[] the
potentiality rule by attempting to litigate the merits of an
underlying lawsuit in the coverage action."  Northern Ins. Co.,
2003 U.S. App. LEXIS 12318, at **9.

　　The question then becomes whether Liberty Mutual was
prejudiced by Black & Decker's alleged delay in notifying it

---

[11]In earlier submissions to the court attached to their
Renewed Submission regarding the Huth sited, Liberty Mutual
attempt to rely on the pollution exclusion in place after July 1,
1971.  In their "Introduction" summarizing the Huth claim and
their arguments, this argument is not included.  Instead, Liberty
Mutual limits themselves to the two arguments addressed in the
main text: (1) that there was no covered occurrence at the Huth
site and (2) that Black & Decker's failure to cooperate relieves
them of any duty to defend.
　　In any event, on the question of the exclusion, Black &
Decker cites to an allegedly "sudden and accidental" occurrence
in 1953.  I find, however, that the underlying allegations relate
to ongoing pollution.  The extrinsic evidence offered by Black &
Decker does not establish that their potential liability will
stem from any sudden and accidental dispersal connected in any
non-tenuous way to the allegations they seek aid in defending
against.

about their prospective liability at the site.  As the Maryland
Court of Appeals made clear in <u>Sherwood</u>, the insurer must
establish prejudice in order to be relieved of pre-notification
defense costs.  Liberty Mutual concedes that "an insurer may deny
coverage based on an insured's failure to cooperate only where
the failure to cooperate has resulted in prejudice to the
insurer," but contends that it "has established such prejudice."
(Pl.'s Supp. Mem., Tab 7, at 59-60.).  Liberty Mutual alleges
that Black & Decker failed to provide prompt notification of a
settlement opportunity along with its notification of the claim
against it.  This failure to cooperate, claims Liberty Mutual,
was prejudicial. (Pl.'s Renewed Huth Sub., at Tab 1.)

     Although one can speculate about how such a delay in
notification could prejudice an insurer, Liberty Mutual does no
more than declare that Black & Decker's actions prejudiced it:
"Because Liberty Mutual was not forwarded the settlement request,
Liberty Mutual lost the opportunity to settle the Huth Oil matter
early on for $50,000."  (Pl.'s Supp. Mem, Tab 7, at 61).
Although Liberty Mutual alleges to have lost the opportunity to
settle the case, it does not declare that it would have done so,
nor what the relative costs involved would have been.  Courts
should not speculate on an insurer's behalf that the costs would
have been less than the defense costs spent by the insured before
it was dismissed from the underlying case.  And, as I explain in
greater detail with respect to the Berks site, <u>infra</u>, a delay in

notification or failure to cooperate alone is not sufficient to preclude coverage.  Summary judgment, accordingly, will enter against Liberty Mutual as to both the duty to defend and the duty to indemnify.

### C. **Douglasville/Berks**

1. Overview

The Douglasville/Berks ("Berks") claim also involves an oil reclamation facility.  The facility, to which oil waste produced by Black & Decker allegedly was transported by A&A in 1973, is located in Berks County, Pennsylvania.  (Defs.' Answers to First Interrogs., Tier II App., at 16; Berks Compl. ¶¶ 41-44, at 145-46.)  The initial CERCLA action was commenced by the United States in 1991 in the Eastern District of Pennsylvania.  (See Berks Compl.)  Black & Decker was named as a defendant in a third party complaint filed on September 16, 1992, by, among others, A&A.  (Berks Third Party Compl., Defs.' Vol XXXI, at 99.)  In August 1993, Black & Decker was dismissed from the lawsuit by an order of the court.  (Dismissal Order, Defs.' Vol XXXII, at 145.)  While Black & Decker did not incur any settlement or remediation payments, it claims defense costs.  (Defs.' SOF, Douglasville ¶ 10, at 19.)

2. Issues Presented

Liberty Mutual claims that no policies predating 1973 are implicated at the Berks site and, therefore, due to the pollution

exclusions in effect, there is no duty to defend. (See Renewed
Sub., at Tab 2.) Liberty Mutual adds that Black & Decker
incurred Berks defense costs prior to tendering its claim to
Liberty Mutual and accordingly may not recover them. (See id.).

Black & Decker argues that because the waste came from
Maryland, the Maryland deletion endorsement applies to the
pollution exclusion. Also, claims Black & Decker, there is
extrinsic evidence potentially tying it to the site during years
where no pollution exclusion was in effect. (See Defs.' Mem., at
160-61.) Finally, on the question of the exclusion, the
defendant references "disastrous floods at the site." (Id. at
161.) As for pre-tender defense costs, Black & Decker argues
that under Maryland law they may recover such defense costs
where, as here, the insurer has not been prejudiced by the delay.

3. Analysis

Liberty Mutual again claims that no pre-1973 policies are
implicated by the allegations at Berks. For the same reasons
stated above, that argument is not persuasive. As Liberty Mutual
argues, the allegations relate to ongoing pollution at the site.
That the evidence may eventually establish liability during a
covered time period is certainly only a potentiality and possibly
a remote one. But potentiality is all that is required to be
shown, and in light of the allegations in the underlying
complaint and Black & Decker's proffer of evidence possibly
linking it to the site before 1973, I find that the broad duty to

-53-

defend has been triggered.

As for Liberty Mutual's argument that it was prejudiced by
Black & Decker's delay in notification, it has provided no
evidence on which I can base a finding that the defense costs
paid by Black & Decker were unreasonable.  There are no
indemnification costs.  Without such evidence, there is no basis
to find prejudice.  The result was amenable to Black & Decker and
the costs they spent to reach that result have not been
challenged as excessive.  Instead, Liberty Mutual attempts to
rely on a legal principle no longer applied in Maryland.

Liberty Mutual argues that "[u]nder Maryland law, an insurer
has no duty to defend an insured absent a request by the insured
to do so and the insurer's obligations under the insurance
contract are ordinarily triggered only when the insured tenders
the defense of an action potentially within the policy coverage."
(Pl.'s Supp. Mem, at 55 (citing Washington v. Federal Kemper Ins.
Co., 60 Md. App. 288, 297 (Md. App. 1984).).  The Maryland Court
of Appeals disapproved of this approach, explicitly rejecting the
Court of Special Appeal's adoption of it in Washington.  See
Sherwood, 698 A.2d at 1084 (noting that the Court of Special of
Appeals had adopted the approach in Washington).  The Sherwood
court found:

> The duty necessarily preexists; the breach arises from the
> insurer's conduct following the notice. In this construct,
> it adds nothing to posit that the duty arises only upon the
> giving of notice, for it is still the insurer's conduct
> following the notice that determines the outcome. If the

> insurer declines to defend on the ground of the delayed
> notice, the question is whether it suffered sufficient
> prejudice from the delay; if some other policy defense is
> asserted, the issue is whether the defense was valid. In
> either case, the viability of the insurer's action goes to
> the question of breach, not the existence of the underlying
> duty.

Id. at 1084-85. Liberty Mutual must establish, beyond mere

assertion, that it was prejudiced by the delay. Here, it has

failed to do so, simply recounting the chronology of events, then

-- in a conclusory fashion -- claiming there was no defense to

tender.

Turning to the application of the pollution exclusion, for

the reasons laid out above, I find that the deletion endorsement

does not apply in this case. The dispersal of pollutants

occurred in Pennsylvania. Under the pollution exclusion, the

policy does not cover dispersals in Pennsylvania. Pursuant to

the deletion endorsement, the exclusion does not apply when there

have been dispersals in Maryland. Therefore, the exclusion

applies here to forego any recovery under the policies containing

a pollution exclusion.

Relying on the underlying allegations in the complaint does

not lead to a finding that "sudden and accidental" occurrences

relieve Black & Decker from the exclusions, to the extent they

are implicated. Black & Decker's reliance on flooding caused by

storms at the site is not evidence establishing potential

liability in light of the nature of the underlying allegations

against which it seeks aid in defending.  The complaint implicates ongoing pollution damage at the site.  There is no basis to find that the flooding referenced by Black & Decker formed an appreciable portion of damage for which it may potentially be liable based on the allegations in the underlying complaint.  Any number of events, as a cumulative matter, may have contributed to the damage at the site.  Looking at the nature of the complaint, however, I find that the claim relates to damage resulting from repetitive, long-term pollution.

In relation to the Berks site, having already found that there are material questions of fact regarding the existence and provisions of pre-1970 policies, there is no basis for summary judgment for those policy years.  I find, however, that Black & Decker has sufficiently demonstrated a potentiality of liability under the complaint for at least one policy year (1970-1971) not containing the pollution exclusion.  The duty to defend is thereby triggered.

### V. <u>Conclusion</u>

For the reasons stated more fully above,

(1)  Summary judgment is hereby GRANTED to Liberty Mutual as establishing no duty to defend or to indemnify as to the BROS site.  Judgment for the plaintiff will enter forthwith;

(2)  Summary judgment is hereby GRANTED to Black & Decker

establishing that Liberty Mutual owed it a duty of defense and a duty to indemnify as to the Huth site.  The parties shall submit a form of judgment reducing the matter to specified damages on or before January 28, 2005; and

(3)  Summary judgment is hereby GRANTED to Black & Decker establishing that Liberty Mutual owed it a duty of defense as to the Berks site.  The parties shall submit a form of judgment reducing this determination to specified damages on or before January 28, 2005.


/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE